**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FIRST FLO CORPORATION | ) | Case No. 18- |
| EIN: 84-0725524 | ) | |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION DATED**
**DECEMBER 17, 2018**

SHAPIRO BIEGING BARBER OTTESON LLP

Duncan E. Barber, #16768
Julie Trent, #17086
7979 E. Tufts Avenue, Suite 1600
Denver, Colorado 80237
Telephone (720) 488-0220
Facsimile (720) 488-7711
dbarber@sbbolawyers.com
jtrent@sbbolaw.com
Attorneys for Debtor

528657v5

# I. INTRODUCTION

## A.    PURPOSE OF THIS DISCLOSURE STATEMENT

First Flo Corporation ("**First Flo**" or the "**Debtor**") submits this Disclosure Statement ("**Disclosure Statement**") to provide information allowing its creditors and shareholders to make an informed vote on the Chapter 11 Plan of First Flo Corporation attached hereto as **Exhibit A** (the "**Plan**").  Capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  Please refer to Article 1 of the Plan that contains definitions.  This Disclosure Statement describes the Plan and explains Debtor's views regarding certain pre-bankruptcy operating and financing history and the events leading up to the commencement of Debtor's Bankruptcy Case.

Subject to the rights of certain parties in interest to object to the allowance and/or priority of such claims as expressly set forth in the Plan, the Plan provides for the payment of Allowed Administrative Claims and the recapitalization of Debtor, through a contribution of additional capital from Debtor's those existing shareholders (defined in the Plan as Equity Interests) who elect to make New Capital Contributions in connection with the Offering, a reduction in the total amount owing on the Senior Debt with periodic payments on the reduced amount following the Effective Date of the Plan, partial payment of, and the cancellation of the remaining balance owing, on the TruPS Capital Securities and payment to the TruPS Trustees.

Only the holders of Allowed Claims or Equity Interests in a Class that is Impaired under the Plan are entitled to vote on the Plan.  Voting rights of individual Classes are outlined in detail below.

This Disclosure Statement, among other things, (i) contains certain information regarding Debtor's prepetition history, (ii) describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that holders of Allowed Claims and Equity Interests must follow for their votes to be counted.

## B.    DISCLAIMERS AND LIMITATIONS

This Disclosure Statement is intended to provide such information as may be material, important and necessary for a reasonable investor typical of the Holders of Impaired Claims to make an informed decision whether to vote in favor of or against the Plan.  This Disclosure Statement, therefore, describes the business background and operating history of Debtor, explains certain significant events that preceded the Bankruptcy Case, describes the bankruptcy Estate's assets, summarizes the terms of the Plan, and provides relevant financial information.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.  YOU ARE URGED TO REVIEW THE PLAN CAREFULLY BEFORE VOTING.**

All holders of Claims against and Equity Interests in Debtor are urged to read this Disclosure Statement and the Plan in full.  Debtor's Board of Directors and management believe

that the Plan is in the best interests of holders of Claims against, and Equity Interests, in Debtor. Accordingly, holders of Allowed Claims are urged to vote in favor of the Plan and Equity Interests to participate in the Offering.

No person has been authorized to give any information or to make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. All summaries herein are qualified by reference to the Plan as a whole. Unless otherwise indicated, Debtor's management has provided the factual information in this Disclosure Statement. Debtor believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of Chapter 11. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "**SEC**"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein. Any representation to the contrary is a criminal offense. Debtor will seek approval of this Disclosure Statement under Bankruptcy Code § 1125 after the Case is commenced.

**IN MAKING A DECISION IN CONNECTION WITH THE PLAN, HOLDERS OF ALLOWED CLAIMS AGAINST AND EQUITY INTERESTS IN DEBTOR MUST RELY ON THEIR OWN EXAMINATIONS OF DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THEY SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND EACH HOLDER SHOULD CONSULT ITS OWN ADVISORS WITH RESPECT TO THOSE MATTERS.**

This Disclosure Statement is being transmitted to certain holders of Claims against and Equity Interests in Debtor for the purpose of soliciting votes on the Plan and for informational purposes.

**WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN DEBTOR WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN. ONLY THE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN DEBTOR AS OF THE PETITION DATE SHALL BE ALLOWED TO VOTE ON THE PLAN.**

THIS DISCLOSURE STATEMENT IS THE PRIMARY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING DEBTOR OTHER THAN THE INFORMATION CONTAINED HEREIN.

DEBTOR WILL SEEK AN ORDER FROM THE BANKRUPTCY COURT AFTER THE BANKRUPTCY CASE IS FILED APPROVING THIS DISCLOSURE STATEMENT UNDER BANKRUPTCY CODE § 1125.  IF THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT, THEN YOUR VOTE WILL BE VALID AND EFFECTIVE.

## C.    FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information.  These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  These statements are based on the existing expectations of Debtor's management, which in turn are based on information that is currently available to them and on the current economic, regulatory and competitive environment, including factors such as general economic and business conditions in those areas in which Debtor operates, demographic changes, competition, fluctuations in interest rates, changes in business strategy or development plans, changes in governmental regulation and credit quality, among other things.  Many possible events or factors, including changes from current conditions in the factors mentioned above, could affect Debtor's future financial results and performance and could cause those results or performance to differ materially from those expressed in our forward-looking statements.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue" or the negative of these terms or other comparable terminology.

Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein.  Although Debtor believes that the expectations reflected in the forward-looking statements are reasonable, Debtor cannot guarantee future results, events, levels of activity, performance, or achievements.  Debtor expressly disclaims a duty to update any of the forward-looking statements.

## D.    DEFINITIONS

1.    **Defined Terms in the Plan**.

Capitalized terms that are not otherwise defined herein, have the meanings ascribed to them in the Plan.

2.    **Other Terms**.

The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to the Disclosure Statement as a whole and not to any particular section, subsection, or clauses contained in the Disclosure Statement unless otherwise specified herein. A term used herein or elsewhere in the Disclosure Statement that is not defined herein or in the Plan shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules. The headings in the Plan are only for convenience of reference and shall not limit or otherwise affect the provisions of the Plan.

## II.  CLASSIFICATION OF CLAIMS AND INTERESTS

The following table summarizes the classification, under the Plan, of the Claims against, and Equity Interests in, Debtor, the status of such Classes as impaired or unimpaired and the voting rights of each Class. The summary contained in the table is qualified in its entirety by reference to the provisions of the Plan and by the balance of this Disclosure Statement. The treatment of the Allowed Claims against and Equity Interests in Debtor for all Classes of Claims and Equity Interests are described in more detail elsewhere in this Disclosure Statement.

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Senior Debt Holder Claims | Impaired | Entitled to Vote |
| 2 | TruPS Claims | Impaired | Entitled to Vote |
| 3 | Equity Interests | Impaired | Deemed to have Rejected the Plan |

## III.  HISTORY OF THE DEBTOR

## A.    OVERVIEW OF BUSINESS OPERATIONS

First Flo Corporation is a Colorado corporation organized in 1976 and is registered as a holding company under the Bank Holding Company Act, 12 U.S.C. §§ 1841, *et seq*. Its only subsidiary is Rocky Mountain Bank & Trust, a Colorado state-chartered banking corporation (the "**Bank**"), with principal offices located at 101 E. Main Street, Florence, Colorado 81226. The Bank operates a branch facility at 755 Cheyenne Meadows, Colorado Springs, Colorado 80906. The Bank has approximately 23 employees.

Debtor, through the Bank, offers checking, savings, money market accounts, mortgages, home equity and other consumer loans, credit cards, annuities, investment products and related consumer financial services. Debtor also provides banking services to businesses, including checking accounts, lines of credit, secured loans and commercial real estate loans. Debtor's branches serve as the primary vehicle through which it offers products, cross sells additional products to existing customers, and generates new customer relationships. In addition to its

branches, Debtor provides certain products and services online via its website located at www.rmbt.com.

Debtor is subject to extensive federal and state regulation and supervision, in particular by the Board of Governors of the Federal Reserve System ("**Federal Reserve**"), while the Bank is regulated by the FDIC and the Colorado Division of Banking.

## B.     DEBT STRUCTURE OF THE DEBTOR; ASSETS

### 1.      Senior Debt.

The Senior Debt (Class 1 in the Plan) arises out of a Loan Agreement, dated as of September 26, 2008, originally made by Bankers' Bank of the West. At the beginning, the Senior Debt was secured by Debtor's stock ownership in the Bank (the "**Bank Stock**"). Gideon Management, LLC, and Micah 68, LLC (collectively defined in the Plan as "**Senior Debt Holders**"), purchased the Senior Debt and released the security interest in the Bank Stock. The Senior Debt is now unsecured but is senior in priority to the TruPS Claims under the documents evidencing the TruPS indebtedness (the "**TruPS Documents**"), below discussed. The maturity date of the Senior Debt has been extended from time to time. Debtor failed to make principal reduction payments due on the Senior Debt on October 31, 2010, and has made no payments on the Senior Debt since then. As of the Petition Date, the Senior Debt is in default. As of the date of this Disclosure Statement, the amount due on the Senior Debt exceeds $5,000,000.00.

The Senior Debt Holders, directly or through affiliates, also hold Equity Interests in an aggregate amount of less than 10%.

### 2.      TruPS Capital Securities.

Debtor issued the TruPS Capital Securities pursuant to the TruPS Documents. The TruPS Capital Securities were issued by RMBT Capital Trust I, a Delaware statutory trust, which obligation was guaranteed by Debtor. Debtor believes that the Bondholder is the sole holder of 100% of the TruPS Capital Securities and has the sole right to payment of $320,000.00 in cash provided in Section 3.4 of the Plan.

Debtor failed to make its scheduled interest payment due on the TruPS Capital Securities on March 6, 2014, in the amount of $19,618.85. The TruPS Trustee notified Debtor of that default on or about April 11, 2014. However, as discussed below, Section 1 of a Written Agreement dated July 16, 2011, with the Federal Reserve Bank of Kansas City ("**Kansas Fed**") prohibits payments on the TruPS Capital Securities without prior written approval from the Kansas Fed. Further, Section 15.02 of the TruPS Indenture prohibits Debtor from making payments on the TruPS Capital Securities when the Senior Debt is in default. The amounts owing under TruPS Documents are defined in the Plan as the "TruPS Claims", which includes amounts owing to the Indenture Trustee.

As of the date is this Disclosure Statement, the amount owing on the TruPS Claims exceeds $5,000,000.00. The TruPS Indenture provides that the TruPS Claims are subordinate to "Senior Indebtedness" as that term is defined in the TruPS Indenture. The Senior Debt constitutes "Senior Indebtedness" under the TruPS Indenture.

Bondholder has represented to Debtor that Bondholder is the sole owner, with both legal and equity title, of 100% of the TruPS Capital Securities and has the sole right to receive payment of the $320,000.00 in cash payment provided for in Section 3.4 of the Plan.

3.   **Operating Expenses**.

Given that Debtor's corporate enterprise consists primarily of owning the stock in the Bank and the Written Agreement (defined below), Debtor incurs few expenses other than, for example, those expenses, including interest arising in connection with the Senior Debt and the TruPS Claims, taxes and expenses arising in connection with Debtor's efforts to reorganize. Except as set forth herein, Debtor likewise has no employees, owns no real property, and has no material contracts other than in connection with the Senior Debt and TruPS Claims.

4.   **Taxes**.

Debtor is current with all of its tax obligations and has a significant tax loss carryforward. Debtor believes its tax loss carryforward is approximately $11,860,000.00 as of December 31, 2017, and that Reorganized Debtor will be entitled to utilize its tax loss carryforward after the Effective Date of the Plan in accordance with applicable law and regulations.

5.   **Assets**.

Debtor's assets consist of its 100% stock ownership in the Bank and its tax loss carryforward. Debtor believes the bank stock has a value of less than $4,000,000.00 based on its capital and the regulatory restrictions it operates under. A primary goal of the reorganization to be realized from confirmation of the Plan is to enable Debtor to remove its regulatory restrictions through reduction of its debts and then by raising additional capital, among other things.

Debtor's tax loss carryforward, while substantial, can only be used if there is not a substantial change in ownership and Debtor generates profits in the future. Thus, without the proposed restructure under the Plan, it is unlikely Debtor will be in a position to realize this asset.

## C.   EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASE

1.   **Regulatory Actions**.

In July 2011, Debtor, the Bank and the Kansas Fed entered into a Written Agreement dated July 16, 2011 ("**Written Agreement**"). The Written Agreement prohibits payments on the Senior Debt and on the TruPS Claims, as well as a number of other restrictions, without written approval from the Kansas Fed. One such restriction is a prohibition on the Bank declaring dividends to Debtor, which Debtor could then use to make payments on the Senior Debt and the TruPS Claims, as well as other payments in the ordinary course of business. Fundamentally, Debtor needs to attract additional capital investment in order to increase the business of the Bank. But with the Senior Debt and TruPS Claims in default and the dividend restriction, Debtor is unable to raise additional capital investment.

Debtor has worked diligently to have the Written Agreement terminated and, thereby, resume ordinary operations. Debtor has met numerous times with the Kansas Fed and made numerous proposals. The result of those efforts has resulted in Kansas Fed's consent for Debtor to seek restructure of the Senior Debt and TruPS Claims as provided in the Plan.

2. **Debtor's Efforts to Recapitalize**.

As stated above, in order to grow the Bank's business and Debtor's capital base, it is necessary for Debtor to raise additional capital, among other things. Without increasing its capital, Debtor has no current ability to repay its Creditors. The defaults on the Senior Debt and the TruPS Claims, and the regulatory actions described above, have prevented Debtor from raising additional capital. Debtor has investigated various options to recapitalize. However, Debtor has been unable to raise any additional capital at this time without a restructuring of its liabilities. Further, as noted above, Bank is currently prohibited by the regulatory authorities from distributing any dividends to Debtor, thus making efforts to raise capital essentially impossible. Accordingly, Debtor believes this Plan of reorganization represents the best possibility of recovery to its Creditors and Equity Interests.

## IV.   PARTIES ENTITLED TO VOTE UNDER THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on the Plan. Creditors whose Claims are not Impaired by the Plan are deemed to accept the Plan under Bankruptcy Code § 1126(f) and are not entitled to vote. Further, a Holder of a Claim or an Equity Interest that does not receive or retain any property under the Plan on account of such Claim or Equity Interest is deemed to reject the Plan under Bankruptcy Code § 1126(g). Under the Plan, the Holders of Claims in Class 1 (Senior Debt), Class 2 (TruPS Claims) and Class 3 (Equity Interests) are entitled to vote on the Plan.

## A.   VOTING REQUIREMENTS, CONFIRMATION HEARING, AND CRAM DOWN

1. **Voting Requirements**.

Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and for Classes containing more than one Claim or Equity Interest, a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims or Equity Interests of such Class.

Only Holders of Allowed Claims and Equity Interests shall be entitled to vote on the Plan. A Claim to which an objection has been filed is a Disputed Claim, not an Allowed Claim, unless and until the Bankruptcy Court rules on the objection and has Allowed the Claim. Therefore, although Holders of Disputed Claims will receive Ballots, their votes will not be counted unless the Bankruptcy Court, prior to the Confirmation Hearing, rules on the objection and allows the Claim or, on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan prior to the time for Ballots to be returned. A vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection was not solicited or procured in good faith and in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

2.      **One Vote per Holder**.

If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

**B.      PROCEDURES AND DEADLINES FOR COMPLETING BALLOTS AND VOTING**

A Ballot for accepting or rejecting the Plan is enclosed for use by those entitled to vote on the Plan.  Parties entitled to vote should carefully read the instructions contained on the Ballot and complete, date, sign and email the Ballot **dbarber@sbbolaw.com** so that it is received no later than **December 20, 2018**.

In order for your vote to be counted, your properly completed Ballot must be actually received at Shapiro Bieging Barber Otteson LLP, Attn: Duncan E. Barber, via email at **dbarber@sbbolaw.com** no later than December 20, 2018.

**C.      PROCEDURES FOR VOTE TABULATION**

In determining whether the Plan has been accepted or rejected, any Ballot timely received that contains sufficient information to permit the identification of the claimant, is signed by the claimant or an authorized agent, and is cast as an acceptance or rejection of the Plan, will be counted.

The following Ballots will not be counted in determining whether the Plan has been accepted or rejected: (a) any Ballot received after the voting deadline as set by the Bankruptcy Court; (b) any Ballot that is not signed or that contains insufficient information for the identification of the claimant or Equity Interest; (c) any Ballot timely received that indicated neither an acceptance nor a rejection of the Plan; (d) any Ballot timely received that both indicated an acceptance and a rejection of the Plan; (e) any Ballot cast by (i) a creditor who is not listed as a creditor on Debtor's Schedules or whose Claim is listed as disputed, contingent or unliquidated, and who has not timely filed a proof of claim with respect to the Claim being voted; or (ii) a creditor who has timely filed a proof of claim that is the subject of an objection and who has not obtained the temporary allowance of its claim for voting purposes; and (f) any Ballot cast by a person who does not hold a Claim or Equity Interest in the Class in which it voted.

Whenever two or more Ballots are cast by the Holder of the same Claim or Equity Interest prior to the Voting Deadline, the last Ballot received prior to the Voting Deadline will be deemed to reflect the voter's intent and thus supersedes prior Ballots.

**D.      CONFIRMATION HEARING**

The Bankruptcy Court will set a hearing on Confirmation of the Plan and to consider objections to Confirmation, if any.  The Confirmation hearing will be held in a Courtroom to be determined at the Bankruptcy Court which is located at the US Custom House, 721 19th Street, Denver, Colorado 80202-2508.  At the hearing, the Bankruptcy Court will consider whether the

Plan satisfies the requirements of the Bankruptcy Code. All parties in interest will receive notice of the date and time of the Confirmation hearing once such hearing is scheduled.

### E.   CRAMDOWN

If any class of Claims fails to accept the Plan, the Bankruptcy Court may confirm the Plan in accordance with Bankruptcy Code § 1129(b) on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to any non-accepting, impaired Class. To the extent an Impaired Class rejects the Plan, Debtor will seek confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

### F.   EFFECT OF CONFIRMATION OF THE PLAN

Confirmation of the Plan makes the Plan and its provisions binding on Debtor, all Creditors and all holders of Equity Interests, and other parties in interest, regardless of whether they have accepted or rejected the Plan. As a result, Creditors and Equity Interests may receive payment on their Claims or retain their Equity Interest, as the case may be, only in accordance with the Plan and the Confirmation Order. If confirmed, the Effective Date of the Plan will be when the conditions set forth in Article VIII of the Plan are satisfied.

### G.   APPROVAL OF THE DISCLOSURE STATEMENT

A decision by the Bankruptcy Court to approve this Disclosure Statement under Bankruptcy Code § 1125 is a finding that the Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor typical of holders of Impaired Claims and Equity Interests to make an informed judgment about the Plan and is not a recommendation by the Bankruptcy Court either for or against the Plan.

An order approving this Disclosure Statement will be sought from the Bankruptcy Court after this Bankruptcy Case is filed.

## V.   <u>DESCRIPTION OF THE PLAN</u>

### A.   DESCRIPTION OF THE PLAN AND MEANS OF IMPLEMENTATION

The following is a brief summary of certain provisions of the Plan; however, this summary is not comprehensive. The Plan – and not the Disclosure Statement – is the legally operative document that controls the relationship between Debtor and the holder of the Claims and Equity Interests and a complete copy of the Plan is attached hereto as **<u>Exhibit A</u>**. The Plan should be read carefully and independently of this Disclosure Statement. Creditors and Equity Interest holders are urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan.

### B.   TREATMENT OF CLAIMS AND INTERESTS

The Plan provides that claims will be treated based upon their type, as follows:

1. **Unclassified Claims**.

   (a) **Administrative Claims**.

Each allowed Administrative Claim shall be paid on the date on which such Administrative Claim becomes payable under applicable law or any agreement relating thereto from the Proceeds of the Offering in cash in the amount of such Allowed Administrative Claim, except to the extent that the Holder of such Administrative Claim has agreed, in writing, to a different treatment of such Administrative Claim; provided, however, that post-petition trade debt, wages, commissions, taxes and other accrued expenses shall be paid by Debtor in the ordinary course of business.

All payments for Professional Fee Claims shall be subject to approval of the Bankruptcy Court. Any Administrative Claim not Allowed as of the Effective Date but Allowed thereafter, shall be paid within ten days after such Administrative Claim becomes an Allowed Administrative Claim.

   (b) **Unsecured Priority Tax Claims**.

The Allowed Claims of claims from governmental taxing authorities shall be paid in full in the ordinary course of business following the Effective Date. Debtor believes that it will be entitled to use its tax loss carryforward following the Effective Date. Debtor believes its tax loss carryforward is approximately $11,860,000.00 as of December 31, 2017. Under the Plan, Reorganized Debtor will retain its loss carryforward in accordance with applicable law and regulations.

2. **Classified Claims**.

The remaining Claims and Equity Interests are divided into three (3) Classes.

   (a) **Class 1 Claim – Senior Debt**.

The Class 1 Claim shall be Allowed in a reduced amount of up to $3,000,000.00. Further, the amended terms of the Senior Debt provide that it shall bear non-compounded interest at a rate of 6% per annum and the Senior Debt, excluding the Contingent Senior Debt Payment shall be due and payable ten (10) years from the date of the Effective Date (the "**Maturity Date**"). The holders of the Senior Debt shall be entitled to receive from the Debtor quarterly interest only payments on each of March 31, June 30, September 30 and December 31 beginning on the earlier of (i) the date that the next quarterly payment is due following receipt of approval from the Federal Deposit Insurance Corporation allowing Rocky Mountain Bank & Trust, a wholly-owned subsidiary of Debtor, to pay dividends to Debtor and Debtor is no longer subject to any legal or regulatory restrictions that prohibit or otherwise limit making such payments, or (ii) three years from the Effective Date. There is no prohibition against pre-payments of the Senior Debt, provided however, that prepayment shall not eliminate the Contingent Senior Debt Payment.

In the event that Debtor is permitted to, and does, declare and pay dividends on its capital stock, then an amount equal to the amount of such paid dividends shall be paid to the Senior Debt Holders as a prepayment of the Senior Debt, excluding the $1,000,000.00 maximum amount of the Contingent Senior Debt Payment.

If, prior to the later of (x) Maturity Date or (y) the date upon which the Senior Debt is paid in full, Debtor sells all or substantially all of its assets or the assets of the Bank, then the Senior Debt Holders shall be entitled to receive a payment on the Contingent Senior Debt Payment as follows:

- if the Transaction Value received by either Debtor or its shareholders in the transaction is less than $3,000,000.00, then the Senior Debt Holders shall receive $0;

- if the Transaction Value received by either Debtor or its shareholders in the transaction is between $3,000,001.00 and $5,000,000.00, then the Senior Debt Holders shall receive $500,000.00, or

- if the Transaction Value received by either Debtor or its shareholders in the transaction is $5,000,001.00 or more, then the Senior Debt Holders shall receive $1,000,000.00.

Class 1 is impaired and is entitled to vote on the Plan.

(b)     **Class 2 Claims – the TruPS Claims**.

The Class 2 Claims will be an Allowed Claim in the aggregate amount owing under the TruPS Documents, which amount exceeds $5,000,000.00 as of the date of the Disclosure Statement.  In full satisfaction of the Allowed Claim of Class 2, holders of the TruPS Capital Securities will receive its Pro Rata share of $320,000.00 in cash upon the deemed surrender of the TruPS Capital Securities in accordance with Section 5.4 of the Plan, which amount shall be paid in accordance with Section 5.7 of the Plan promptly following the Effective Date.  Debtor, as holder of the TruPS Common Securities, shall not be entitled to any distribution on account of their TruPS Claim.  Class 2 is impaired and Holders of Allowed Claims in Class 2 are entitled to vote on the Plan.  By voting in favor of this Plan, the Bondholder shall be deemed to have represented and warranted to Debtor and to the TruPS Trustees that Bondholder is the sole owner, with both legal and equity title, of 100% of the TruPS Capital Securities and has the sole right to receive payment of the $320,000.00 in cash payment provided for in the Plan.

(c)     **Class 3 Claim – the Equity Interests**.

Class 3 consists of the Equity Interests in Debtor held as of the Petition Date.  Upon the Effective Date, in exchange for the New Capital Contribution, each Participating Investor shall retain their respective Equity Interests.  The Equity Interests of Holders who are not a Participating Investor shall have their Equity Interests cancelled by Debtor and such Holders shall have no further interest in Debtor.  Class 3 is impaired and entitled to vote on the Plan.  The

Holders of Equity Interests shall receive no distribution under the Plan except as provided in the connection with the Offering.

        3.      **Executory Contracts and Unexpired Leases**.

        (a)      **Assumption or Rejection of Executory Contracts and Unexpired Leases**.

On the Effective Date and except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases that have not been the subject of a motion or order to assume and/or assign during the course of the Bankruptcy Case or pending the occurrence of the Effective Date, shall be deemed rejected by Debtor as of the Petition Date. The Plan shall be deemed to constitute a motion to approve the above-described rejection and entry of an order confirming the Plan shall constitute approval of such rejection.

        (b)      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**.

All proofs of claim with respect to claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Bankruptcy Court within thirty (30) days after the earlier of (i) the date of the Bankruptcy Court order approving Debtor's rejection of such executory contract or unexpired lease, or (ii) the Confirmation Date. Any claims not filed within such time shall be forever barred against Debtor and the Estate and any such Claims shall be disallowed in full.

Other than the loan documents evidencing the Senior Debt and the TruPS Documents, Debtor does not believe there are any other Executory Contracts or Unexpired Leases. The treatment of loan documents evidencing the Senior Debt and the TruPS Documents is set forth in the Plan.

**D.     IMPLEMENTATION OF THE PLAN**

        1.   **Debtor in Possession**.

During the period from the Confirmation Date through and until the Effective Date, Debtor may continue to operate its business as a debtor in possession, subject to all applicable orders of the Bankruptcy Court.

        2.   **Rights Offering; Securities Law and Bankruptcy Code Section 1145**.

Debtor will conduct the Offering to raise the Proceeds. In the Offering, the Holders of Debtor's Equity Interests will be entitled to make a New Capital Contribution to Debtor and in exchange will be entitled to retain their respective Equity Interests. Non-Participating Shareholders will have their Equity Interests cancelled and such Holders will have no further interest in Debtor. Participating Investors will have the option, as determined by Debtor, to make additional Capital Contributions to Debtor in proportion to their pre-petition ownership of Debtor's Equity Interests and such Participating Investors shall receive additional Equity Interests in Debtor as needed to satisfy the Conditions to Confirmation. The Offering will commence promptly following the occurrence of the Confirmation Date.

Subject to approval by the Bankruptcy Court, the Confirmation Order shall provide that the Offering, to the extent it requires compliance with state and federal securities laws, including without limitation the Securities Act, is entitled to the exemption from registration provided under Bankruptcy Code section 1145. Post-Effective Date sales of the stock shall be governed by applicable non-bankruptcy law.

3. **Governance Documents and Corporate Existence**.

Except as otherwise provided in the Plan, Debtor shall continue to exist after the Effective Date in accordance with the applicable laws of the State of Colorado and pursuant to Debtor's Articles of Incorporation and bylaws.

On the Effective Date, Debtor will change its name to "RMBT Holding Company."

4. **Reorganized Debtor's Board of Directors and Officers**.

Debtor's pre-petition Board of Directors and Officers will remain the Board of Directors and Officers of Reorganized Debtor after the Effective Date. Accordingly, Douglas McClure shall serve as Chief Executive Officer and Chairman of the Board of Directors and Dale Pike shall serve as Secretary/Treasurer of the Reorganized Debtor. None of the Officers or Directors of Reorganized Debtor will initially receive any compensation from Reorganized Debtor for serving in these capacities.

5. **Surrender of Cancelled Instruments or Securities**.

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to the Plan, the holder of such Claim will tender any applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such holder and certifying that they have been lost), to the Plan Administrator unless waived in writing by the Debtor.

E. **CONDITIONS PRECEDENT TO THE CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**

1. **Conditions to the Confirmation**.

The following are conditions precedent to the occurrence of the Confirmation Date: the entry of **(a)** an Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code § 1125, and **(b)** the Confirmation Order in form and substance acceptable to Debtor, which shall provide, among other things, that Debtor is authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan.

2. **Conditions to the Effective Date**.

The Plan will be binding on all creditors, Equity Interest Holders and other parties in interest on the date that the following conditions precedent have occur which date is referred to as the Effective Date:  (a) the Conditions to Confirmation shall have occurred; (b) the payments to Class 2 and the TruPS Trustee Fees in accordance with Section 9.3 have been approved by the Board of Governors of the Federal Reserve System; and (c) the completion of the Offering in which the amount of Proceeds raised are sufficient to fund payments to Allowed Administrative Claims, the Allowed Claims of Class 2 and the TruPS Trustee Fees.

3. **Outside Date**.

If the Effective Date has not occurred on or before the Outside Date (which is 180 days after the Confirmation Date), then the Plan will be deemed void and of no further effective and the rights and obligations of all parties in interest shall be reinstated as they exist immediately before the Petition Date, provided however, that Debtor may extend the Outside Date for 90 days by filing a written notice with the Court and providing notice thereof to all parties in interest. Debtor believes this is sufficient time in order to effectuate and close the Offering.

## F.    SOURCES OF INFORMATION FOR DISCLOSURE STATEMENT; FINANCIAL REPORTING

Substantially all of the factual information utilized in this Disclosure Statement, including but not limited to the amount of Claims, was obtained from information provided by Debtor's books, records and Schedules.

## G.    TAX CONSEQUENCES OF PLAN

Neither Debtor nor any of its officers, directors, employees, agents or affiliates are offering income tax advice with respect to the Plan.  Creditors and Equity Interests concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.

## IV.  <u>FEASIBILITY AND RISK FACTORS</u>

## A.    GENERAL FEASIBILITY ANALYSIS

Pursuant to Bankruptcy Code § 1129(a)(11), one of the requirements for confirmation of a plan of reorganization is a determination by the Bankruptcy Court that the plan is feasible – that is, that confirmation of the Plan is not likely to be followed by liquidation or by the need for a further financial restructuring, unless such is specifically provided for in the Plan.  Debtor's management believes the Plan is feasible.  Debtor's management is confident that the Offering will successfully raise the Proceeds needed to satisfy Debtor's obligations under the Plan by the Effective Date.   The reduction in debt that will be effectuated by the Plan will enable Reorganized Debtor to raise additional capital in the future, grow the business of the Bank and generate the funds necessary to make payments to Class 1.

## B.   RISK FACTORS

As with any plan of reorganization or other financial transaction, there are certain risk factors which must be considered.  It should be noted that all risk factors cannot be anticipated, that some events will develop in ways that were not foreseen and that many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed.  Some or all of such variations may be material.  While every effort has been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analysis set forth herein.  Under the Plan, some of the principal risks that Holders of Claims should be aware of, in the view of Debtor, are discussed below.

1.   **General**.

The Plan sets forth the means for satisfying the Allowed Claims against and Equity Interests in Debtor.  Claims are not expected to be paid in full.  Nevertheless, the reorganization of Debtor's business and operations under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with a Chapter 7 liquidation of Debtor.  The Plan has been proposed after careful consideration of all reasonable restructuring alternatives.  Despite the risks inherent in the Plan, as described herein, Debtor believes that the Plan is in the best interests of all parties in interest when compared to all reasonable alternatives.

2.   **Potential Adverse Effects of Chapter 11**.

Although Debtor will seek to make its stay in Chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to its business operations, it is possible that the commencement of the Chapter 11 Case could materially adversely affect business relationships.

3.   **Plan May not be Approved**.

The Plan is subject to approval by the Holders of Allowed Claims in Class 1 (Senior Debt) and Class 2 (the TruPS Claims).  No assurance can be given that the Plan will be accepted by the requisite amount of Holders of Allowed Claims and/or Equity Interests or confirmed by the Bankruptcy Court.  Failure of the Holders of Allowed Claims to vote for the Plan or non-confirmation by the Bankruptcy Court could lead to delay and the incurrence of additional expenses.

4.   **Certain Bankruptcy Considerations**.

Even if all voting Impaired Classes vote in favor of the Plan or if the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Bankruptcy Code section 1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of Debtor, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if Debtor was liquidated under chapter 7 of the Bankruptcy Code.  Although Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

5.      **Bankruptcy-Specific Risk Factors that could Negatively Impact the Debtor's Business**.

(a)      **The Debtor is subject to the risks and uncertainties associated with the Bankruptcy Case**.  For the duration of the Bankruptcy Case, Debtor's operations and its ability to execute its business strategy will be subject to risks and uncertainties associated with bankruptcy. These risks include:

- Debtor's ability to continue as a going concern;

- Debtor's ability to obtain Bankruptcy Court approval with respect to motions filed in the Bankruptcy Case from time to time;

- Debtor's ability to confirm and consummate the proposed Plan or any other plan of reorganization with respect to the Bankruptcy Case;

- the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for Debtor to propose and confirm a plan of reorganization, to appoint a United States Trustee, or to convert the Bankruptcy Cases to chapter 7 cases; and

- Debtor's ability to obtain and maintain normal payment and other terms with vendors and service providers.

(b)      **Debtor's business could suffer from a long and protracted restructuring**.  Debtor's future results are dependent upon the successful confirmation and implementation of the Plan.  Failure to obtain this approval in a timely manner could adversely affect its operating results.  If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of Debtor's enterprise would be substantially eroded to the detriment of all stakeholders.  Even once a plan of reorganization is approved and implemented, Reorganized Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

6.      **Risk Factors Related to the Offering**.

(a)      **There is currently no public or active trading market for shares of Debtor's Equity Interests**.  There is currently no public or active trading market for shares of Debtor's Equity Interests and there can be no assurance that such a market for shares of Debtor's Equity Interests will ever develop in the future.  Debtor's Equity Interests is not listed on any securities exchange or in the over-the-counter market and no dealer makes or has committed to make a market in them.  In addition, Debtor has no present intention of registering Debtor's Equity Interests under the Securities Act of 1933, as amended or the Securities Exchange Act of 1934 unless required to do so.  Accordingly, Equity Interest Holders participating in the Offering may not be able to liquidate their investment in Debtor's Equity Interests or to pledge the Debtor's Equity Interests as collateral and should consider their investment to be long-term.

(b)     **The Cost to Retain the Equity Interests is not necessarily reflective of their fair market value**.  The price at which existing Holders of Equity Interests can retain their Equity Interests was determined by Debtor's board of directors based on several factors including, without limitation, the amount Debtor requires to effectuate the Plan, historical financial results, and current book value.  As such, the offering price should not be construed as being indicative of the present or future value of the Equity Interests.

(c)     **The price paid to retain an Equity Interest is not an insured deposit**. The Equity Interests are not bank deposits and, therefore, are not insured against loss by the FDIC, by any other deposit insurance fund or by any other public or private entity.  Additional investment in the Equity Interests is inherently risky and is subject to the same market forces that affect the value of securities of any company.  As a result, if the Holder of and Equity Interest opts to retain its Equity Interest, it could lose some or all of its investment.

(d)     **Reorganized Debtor may not choose or be able to pay dividends on the Equity Interests**.   Debtor has no present intention of paying dividends, nor does Debtor anticipate paying any dividends in the foreseeable future, with respect to the Equity Interests. Debtor's ability to pay dividends in the future will depend upon its earnings and financial condition, liquidity and capital requirements, the general economic climate, our ability to service any equity or debt obligations senior to the Equity Interests, governmental policies and regulations, Colorado law and other factors deemed relevant by our board of directors.  Debtor's ability to pay any dividends is also dependent upon the ability of the Bank to declare and pay dividends to Debtor, which in turn depends upon such factors as future earnings, financial condition, cash needs, capital adequacy, general business conditions, governmental policies and regulations, Colorado law and other factors deemed relevant by the Bank's board of directors.  In addition, there are certain restrictions imposed by federal banking laws, regulations and authorities on the payment of dividends by Debtor and by the Bank.

(e)     **Equity Interests may be diluted in the future**.  Debtor may issue additional shares of equity in the future.  Future sales of stock by Debtor may be at a price that is less than the price at which the Equity Interest are being retained in the Offering, in which case the stockholders' equity per share purchased in the Offering would be diluted.  Even if Debtor issue additional shares for a price in excess of the retention price under the Plan, the additional issued stock would reduce the percentage of ownership and voting power represented by the shares retained by an investor in the Offering.  Holders of Equity Interests which opt to retain their Equity Interest pursuant to the Offering do not have preemptive rights allowing them to acquire shares that may be sold in the future.  In addition, Debtor may issue employees, officers, directors and others either restricted stock awards or options to purchase equity shares of Debtor in the future.

(f)     **There will be restrictions on the transferability of the Equity Interests**.  Because the Offering is being conducted pursuant to exemptions from registration available under federal and state law, any Equity Interests retained pursuant to the Offering are subject to restrictions on transfer pursuant to applicable federal and state securities laws.  That is the situation that exists **now** with respect to the Equity Interests and it will continue to exist after the Effective Date of the Plan.

# V.  ALTERNATIVES TO THE PLAN

As a condition to confirmation, the Bankruptcy Code requires that creditors receive on account of their Claims at least as much as they would receive if the case were a case filed under Chapter 7 of the Bankruptcy Code. Because the Senior Debt Holders have agreed to reduce the amount owing on the Senior Debt as of the Petition Date and because a distribution will be made on account of the TruPS Claims, Debtor believes that the Plan meets this test. The only feasible way for the payments provided for in the Plan to be made is the reductions agreed to by Classes 1 and 2 and the funds to be advanced by the Participating Investors in the Offering. Moreover, the restructure effectuated by the Plan will enable Debtor to raise additional capital in the future and strengthen its role as a source of financial strength to the Bank.

If the Plan is not confirmed or consummated, the alternatives include: (i) conversion to a liquidation under Chapter 7 of the Bankruptcy Code; (ii) confirmation of an alternative Chapter 11 plan; or (iii) dismissal of the Case.

## A.     LIQUIDATION UNDER CHAPTER 7

In evaluating the Plan, Debtor considered the alternative of a liquidation of its assets under Chapter 7 of the Bankruptcy Code. Debtor believes that the Plan serves to: (i) maximize the distribution to be received by all Holders of Allowed Claims; (ii) allow the Holders of Allowed Claims to vote on approval of the Plan and thereby exercise some control over the distribution process; (iii) expedite distributions to Holders of Allowed Claims; and (iv) significantly minimize potential expenses, which could dilute the amount of estate assets available for distribution to Holders of Allowed Claims.

In a Chapter 7, an independent trustee would be appointed to liquidate the estate. The trustee would be chosen by the United States Trustee's Office for the District of Colorado. The Chapter 7 trustee would make the requisite decisions, subject to the notice requirements of Local Bankruptcy Rule 202 regarding notice and opportunity for hearing, with respect to the liquidation of the Estate, the hiring of professionals, the pursuit of any claims or litigation, the payment or objection to Claims, and the distribution of any ultimate dividend. The Chapter 7 trustee would be paid pursuant to the provisions of Bankruptcy Code § 326(a), although, in certain circumstances, a Chapter 7 trustee can apply to the Bankruptcy Court for a different type of compensation.

Debtor believes that liquidation under Chapter 7 of the Bankruptcy Code would result in substantially less or no distribution being made to the Holders of Allowed Claims. In a Chapter 7 bankruptcy case, the payments effectuated through the Plan would not occur. Rather, the Chapter 7 trustee would simply liquidate the assets of Debtor and pay a portion of the amount owing on the Senior Debt. In such a case, it is anticipated that no payment would be made to the Holders of the TruPS Claims and Equity Interests would be extinguished.

In addition, Debtor believes that conversion to a Chapter 7 liquidation would result in substantial diminution in the value to be realized by Holders of Allowed Claims because of the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other professional persons to assist such trustee (in the case of a Chapter 7

proceeding) and the substantial time which would elapse before creditors would receive any distribution in respect to their Claims.  Debtor believes that the Plan serves to expedite distributions to Holders of Allowed Claims and prevents the potential additional expenses that would be incurred if the Bankruptcy Case were converted to a case under Chapter 7 of the Bankruptcy Code. Conversion of this Bankruptcy Case to a Chapter 7 case would result in additional delays in payment of Allowed Claims by requiring, among other things, the appointment of a new fiduciary, a Section 341 meeting, and a new notice deadline for filing Claims.  Due to the foregoing, Debtor believes that there would be no benefit to the Estate by conversion to Chapter 7.

## B.   ALTERNATIVE PLANS

If the Plan is not confirmed, any other party in interest, subject to certain orders of the Bankruptcy Court, could attempt to formulate a different Plan.  Debtor believes that significant additional costs, risks and delays would be incurred in connection with any alternative plan, and that no party in interest has more incentive to create the best possible plan for creditors than Debtor.  Debtor believes there is no value in its assets beyond the amounts owed to the Senior Debt Holders on account of the Senior Debt.  Without elimination of the TruPS Claims and reduction of the amounts owing on the Senior Debt, Debtor cannot realistically raise additional capital, grow the Bank and obtain termination of the Written Agreement.

While it is certainly possible that, if the Plan is not confirmed, another plan could eventually be confirmed, Debtor believes that it is unlikely that any plan could be developed which would provide greater value or certainty of closure than the Plan proposed herein.  In addition, any such Plan would be a plan, essentially similar and comparable to the results of a Chapter 7 liquidation as described above.

## VI.  REQUIREMENTS FOR CONFIRMATION

In order to confirm the Plan, Bankruptcy Code § 1129(a) requires that the Bankruptcy Court make a series of findings concerning the Plan and Debtor, including:

1.     that the Plan has classified Claims and Equity Interests in a permissible manner;

2.     that the Plan complies with the applicable provisions of the Bankruptcy Code;

3.     that Debtor has complied with applicable provisions of the Bankruptcy Code;

4.     that Debtor has proposed its Plan in good faith and not by any means forbidden by law;

5.     that the disclosures required by Bankruptcy Code § 1125 have been made;

6.     that the Plan has been accepted by the requisite votes of creditors (except to the extent that Confirmation is available under Bankruptcy Code § 1129(b));

7.     that the Plan is feasible and that Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Debtor;

8. that the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired Class by providing the creditors on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that any such Holder would receive or retain in a Chapter 7 liquidation, unless each Holder of a Claim or Interest in such Classes accepts the Plan;

9. that all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing and Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

10. that the Plan provides for the continuation after the Effective Date of all retiree benefits, if any, as defined in Bankruptcy Code § 1114.

Section 1129(b) of the Bankruptcy Code permits the Bankruptcy Court to confirm a Plan of reorganization notwithstanding Debtor's failure to obtain the requisite acceptance of the Plan for each Impaired Class of Claims or Equity Interests, as long as one Impaired Class accepts the Plan. This procedure is known as a "cram down." The Plan may be confirmed over the non-acceptance of an Impaired Class if the other Confirmation requirements set forth in Bankruptcy Code § 1129(a) (other than paragraph (8)) are met, the Plan does not unfairly discriminate with respect to such Class, and (i) the members of the non-accepting Class receive full payment of their Allowed Claim or Allowed Interests, or (ii) the holders of Claims or Interests in such Class are to receive less than full payment, but no Class junior to the non-accepting Impaired Class receives or retains any property under the Plan. If the applicable requirements of Bankruptcy Code § 1129(a), other than paragraph 8 thereof, are met with respect to the Plan, Debtor may request that the Bankruptcy Court confirm the Plan under Bankruptcy Code § 1129(b). Because there is not sufficient value to pay Allowed Claims in full, Debtor has attempted to draft the Plan so that it complies with the requirements of Bankruptcy Code § 1129(b) so as to avoid needless litigation at confirmation. Debtor believes that the Plan complies with Bankruptcy Code § 1129(b).

## VII. <u>FINAL DECREE</u>

Prior to closing this Bankruptcy Case, a Final Decree from the Bankruptcy Court, pursuant to Bankruptcy Rule 3022, must be entered. Debtor will seek entry of a final decree as soon as reasonably practicable after Confirmation.

## VIII. <u>CONCLUSION; RECOMMENDATION; NEW CAPITAL RAISED THROUGH THE OFFERING</u>

In order to fund the payments required under the Plan, existing Equity Interest Holders will be offered the opportunity to advance additional cash and thereby retain their prepetition Equity Interests in Debtor. The Offering is set forth in Sections 5.1 and 5.2 of the Plan and will be effectuated as set forth in Exhibits 1 and 2 of the Plan. As stated elsewhere in this Disclosure Statement, creditors in Classes 1 and 2 will not be paid in full. In order to raise the funds necessary to make payments to Class 2, to the TruPS Trustees and to Allowed Administrative Claims, Debtor will use the Offering.

As of the date of this Disclosure Statement, the amount owing on the Senior Debt exceeds $5,000,000.00. Similarly, as of the date of this Disclosure Statement, the amount owing on the TruPS Securities exceeds $5,000,000.00. As of September 30, 2018, the Bank's reported capital was $5,940,000.00. The most recent valuation obtained for the Bank was $3,905,000.00. The financial position of the Bank, and thus Debtor's primary asset the stock ownership in the Bank, is not materially different as of the date of this Disclosure Statement. Without the reductions in debt which will be effectuated by the Plan, Debtor is unable to raise the capital needed to grow. Confirmation of the Plan will put Reorganized Debtor into a position to grow the Bank in the future.

The holders of the Allowed Class 2 Claims, after extended negotiations, have agreed to accept $320,000.00 in full satisfaction of the amounts owing to such holders under the TruPS Documents. Moreover, the TruPS Trustees have agreed to accept $65,000.00 under the Plan in full satisfaction of amounts owing to the TruPS Trustees under the TruPS Documents. Debtor estimates that the Allowed Administrative Expense Claims will be appropriately $40,000.00. Thus, Debtor will seek to raise approximately $425,000.00 through the Offering.

Debtor's management strongly believes that the Plan and the Offering are the best means for returning value to all parties in interest in the Bankruptcy Case.

Debtor submits that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code, is fair and equitable, and provides for a greater, more immediate and certain return than would likely be achieved under any other reasonable alternative. Therefore, Debtor strongly recommends that Holders of Claims and Equity Interests who are entitled to vote on the Plan vote to accept the Plan.

[Remainder of this [page left blank]

Debtor reminds such Holders that their signed and marked Ballots *must be received* no later than **December 20, 2018** addressed or via email as follows:  Shapiro Bieging Barber Otteson LLP, ATTN:  Duncan E. Barber, 7979 S. Tufts Avenue, Suite 1600, Denver, Colorado 80237 or **dbarber@sbbolaw.com**.

DATED December 17, 2018.

**FIRST FLO CORPORATION**

By: \_\_\_/s/ Dale E. Pike_____
  Name:  Dale E. Pike
  Title: Authorized Agent

**APPROVED AS TO FORM**:

SHAPIRO BIEGING BARBER OTTESON LLP
Duncan E. Barber, 16768
Julie Trent, #17086
7979 E. Tufts Avenue, Suite 1600
Denver, CO 80237
Telephone:  (720) 488-0220
Fax:  (720) 488-7711
Email: dbarber@sbbolaw.com
    jtrent@sbbolaw.com
Attorneys for Debtor

**EXHIBIT A**

**PLAN OF REORGANIZATION**

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FIRST FLO CORPORATION | ) | Case No.  18- |
| EIN: 84-0725524 | ) | |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |

## PLAN OF REORGANIZATION DATED DECEMBER 17, 2018

Duncan E. Barber, #16768
Julie Trent, #17086
SHAPIRO BIEGING BARBER OTTESON
  LLP
7979 E. Tufts Avenue, Suite 1600
Denver, Colorado 80237
Telephone (720) 488-0220
Facsimile (720) 488-7711
Email:  dbarber@sbbolaw.com
        jtrent@sbbolaw.com
Attorneys for Debtor

EXHIBIT A

## INTRODUCTION

First Flo Corporation ("Debtor"), hereby proposes the following Plan of Reorganization dated December 17, 2018 ("Plan"), pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

This Plan provides for the repayment of Creditors' Allowed Claims through the restructure of the Senior Debt, payment to the holders of TruPS Claims and the cancellation of the remaining amounts due to the holders of TruPS Claims and compromise and satisfaction of the TruPS Trustee Fees from the proceeds generated by a new capital raise from those pre-petition shareholders who elect to make a new cash capital contribution to the Post-Confirmation Debtor. A more complete explanation of Debtor's business and of this Plan of Reorganization is contained in the Disclosure Statement which accompanies this Plan. Reference should be made to the Disclosure Statement by all Creditors who intend to cast a ballot for or against this Plan of Reorganization and all other parties in interest.

## ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

A.     **Definitions**.  In addition to such other terms as are defined elsewhere in the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan:

1.1.     **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in §§ 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(1) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Bankruptcy Case; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2) of the Bankruptcy Code.

1.2.     **"Allowed Claim"** means (i) an unsecured claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by Court Order in this Case or scheduled in the list of creditors prepared and filed with the Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, in either case as to which no timely objection to the allowance thereof has been filed pursuant to Bankruptcy Rules 3001 and 3007 or as to which any such objection has been determined by Order or Judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending, or (ii) a Claim allowed by final, non-appealable order of the Bankruptcy Court.

1.3.     **"Allowed Class 2 Claim"** means the Class 2 Claim that is an Allowed TruPS Claim.

EXHIBIT A

1.4. **"Allowed Secured Claim"** means an allowed claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under Bankruptcy Code 553, to the extent the value of the interest of the holder of any such allowed claim and Debtor's interests in such property or to the extent of the amount subject to such setoff as the case may be, as determined in accordance with Bankruptcy Code 506(a).

1.5. **"Bank"** means Rocky Mountain Bank & Trust, a Colorado corporation, a wholly-owned subsidiary of Debtor.

1.6. **"Bankruptcy Case"** means *In re First Flo Corporation*, Case No. 18-_____, to be filed in the United States Bankruptcy Court for the District of Colorado.

1.7. **"Bankruptcy Code"** or **"Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended.

1.8. **"Bar Date"** means the date or dates fixed by the Bankruptcy Court by which Persons asserting a Claim against, or Equity Interest in, the Debtor (except Administrative Expenses, Professional Fee Claims and Claims arising from the rejection of Executory Contracts) are required to file a proof of claim or equity interest or a request for payment or be forever barred from asserting a Claim against or Equity Interest in the Debtor or its property, from voting on the Plan, and from sharing in distributions under the Plan.

1.9. **"Bondholder"** means U.S. Capital Funding VI, Ltd., an exempted company with limited liability formed under the laws of the Cayman Islands, as the sole owner of the TruPS Capital Securities.

1.10. **"Claim"** has the meaning of that term in Bankruptcy Code § 101(5).

1.11. **"Claims Objection Bar Date"** means the date which is 120 days following the Effective Date, unless extended by order of the Bankruptcy Court on motion filed within such 120 day period.

1.12. **"Class"** means any class into which Allowed Claims are classified pursuant to the Plan.

1.13. **"Class 2 Claim"** shall mean the Claims set forth in Sections 2.3 and 3.4 of this Plan.

1.14. **"Code"** means the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and any amendments thereof.

1.15. **"Confirmation"** means entry of a Final Order confirming this Plan in accordance with § 1129 of the Bankruptcy Code.

1.16. **"Confirmation Date"** means the date upon which the Confirmation Order is entered by the Court.

EXHIBIT A

1.17.   "**Confirmation Hearing**" means the duly noticed hearing held by the Bankruptcy Court to consider confirmation of the Plan. The Confirmation Hearing may be adjourned by the Bankruptcy Court from time to time without further notice other than the adjourned date of the Confirmation Hearing.

1.18.   "**Confirmation Order**" means the Order issued and entered confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

1.19.   "**Contested Claim**" means any Claim which has been scheduled by the Debtor as disputed, contingent, or unliquidated or any Claim as to which an objection to the allowance thereof has been or will be filed within the deadline for filing of such objections set forth in Section 6.3 of this Plan.  Contested Claims shall be treated under the provision of Section 6.3 of this Plan until allowance of disallowance of such Claim has been determined by a Final Order. Contested claims further include any Claims held by Creditors against whom the Debtor believes actions may be brought under Sections 544, 547, 548 or 549 of the Bankruptcy Code.

1.20.   "**Contingent Senior Debt Payment**" means the $1,000,000.00 payment that may be paid to the holders of the Senior Debt in the event the Bank is sold pursuant to Section 3.3(A)(v) below.

1.21.   "**Court**" or "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Colorado in which the Case, pursuant to which this Plan is proposed, is pending and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

1.22.   "**Creditor**" has the meaning of that term in Bankruptcy Code § 101(10).

1.23.   "**Creditor Distribution Account**" means the checking account that the Post-Confirmation Debtor shall establish upon occurrence of the Effective Date and into which the Gross Capital Proceeds and any other funds to implement the Plan will be deposited and from which distributions to the Holders of Allowed Administrative Claims and Allowed Claims in Class 2 will be made in accordance with this Plan.

1.24.   "**Debtor**" means First Flo Corporation, a Colorado corporation.

1.25.   "**Delaware Trustee**" means Wilmington Trust, as Delaware trustee under the TruPS Documents.

1.26.   "**Disclosure Statement**" means the Disclosure Statement which is approved by the Court according to Bankruptcy Code §1125 to be utilized to solicit votes for this Plan.

1.27.   "**Effective Date**" means the date upon which the conditions in Article 8 have been satisfied.

1.28.   "**Estate**" shall mean the estate created and existing in this Case pursuant to Bankruptcy Code § 541.

1.29.   "**Executory Contract**" shall mean any executory contract or unexpired lease of real or personal property, as contemplated by §§ 365, 1113, 1114 of the Bankruptcy Code, in

EXHIBIT A

effect on the Petition Date, between Debtors and any Person, and including, without limitation, any written employment agreements or plans and employee benefit plans and agreements.

1.30. **"Equity Interests"** means any interest in Debtor represented by any class or series of common or preferred stock issued before the Effective Date, and any warrants, options, or rights to purchase any such common or preferred stock.

1.31. **"Final Order"** means an order or a judgment as to which the time to appeal or seek review or rehearing has expired.  In the event that an appeal or petition for rehearing is filed, an order or judgment shall be final unless an Order enters granting a stay pending appeal or petition for rehearing.

1.32. "**Guarantee Trustee**" shall mean Wilmington Trust, as guarantee trustee under the TruPS Documents.

1.33. "**HARE & CO.**" means Hare & Co., LLC, a Delaware limited liability company.

1.34. **"Indenture Trustee"** means Wilmington Trust, as indenture trustee under the TruPS Documents.

1.35. **"Insider"** means any person or entity defined in Bankruptcy Code § 101(31)(B).

1.36. **"Maturity Date"** means ten (10) years from the date of the Effective Date.

1.37. **"New Capital Contributions"** means the contributions of new cash in Debtor in an amount required to pay, collectively, Allowed Administrative Claims and the payments specified herein to Class 2 by Participating Investors in connection with the Offering.

1.38. **"Non-Participating Shareholder"** means those persons who are holders of Debtor's Equity Interests who elect to not be a Participating Investor.

1.39. "**Offering**" means the offering to Holders of the Equity Interests to make New Capital Contributions to Debtor pursuant to this Plan.

1.40. "**Outside Date**" means the date that is 180 days after the Confirmation Date.

1.41. **"Participating Investors"** mean those persons making New Capital Contributions to Debtor in the Offering.

1.42. **"Person"** means any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or associated political subdivision.

1.43. **"Petition Date"** means the date on which the Case is commenced under Bankruptcy Code § 301, by Debtor's filing of its voluntary petition.

1.44. **"Plan"** means this Plan of Reorganization dated December 17, 2018.

EXHIBIT A

1.45.    **"Post-Confirmation Debtor"** means the Debtor after the occurrence of the Effective Date pursuant to Article 8 of the Plan.

1.46.    **"Post Confirmation Management"** means those individuals identified in Section 5.3 of the Plan.

1.47.    **"Pro Rata"** means with respect to any holder of an Allowed Claim, the proportionate amount that such Allowed Claim bears to the aggregate amount of the Allowed Claims in the relevant Class.

1.48.    **"Proceeds"** means the cash raised from the Participating Investors in the Offering as provided in the Plan.

1.49.    **"Professional"** means a Person: (a) employed in the Bankruptcy Case in accordance with an order of the Bankruptcy Court under §§ 327, 328 or 1103 of the Bankruptcy Code and to be compensated for services under §§ 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for whom compensation and reimbursement has been Allowed by a Final Order under § 503(b) of the Bankruptcy Code.

1.50.    **"Professional Fee Claims"** mean an Administrative Expense for compensation and reimbursement of expenses of a Professional rendered or incurred before the Effective Date submitted in accordance with §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code.

1.51.    **"Property Trustee"** means Wilmington Trust, as property trustee under the TruPS Documents.

1.52.    **"Reorganized Debtor"** means Debtor following the occurrence of the Effective Date.

1.53.    **"Rules"** mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

1.54.    **"Senior Debt"** means the debt outstanding as of the Petition Date under that certain Loan Agreement between Debtor, as borrower, and Gideon Management, LLC, an Illinois limited liability company, and Micah 68, LLC, an Illinois limited liability company, as lenders, as amended or supplemented from time to time.

1.55.    **"Senior Debt Holders"** mean the holders of the Senior Debt on the Effective Date.

1.56.    **"Senior Debt Parties"** means the Senior Debt Holders; PT Financial, LLC, an Illinois limited liability company; PT Financial Companies, LLC, a Delaware limited liability company, PT Asset Management, LLC, an Illinois limited liability company, Performance Trust Capital Partners, an Illinois limited liability company; PT2 LLC, an Illinois limited liability company; PT INV, LLC, an Illinois limited liability company; PT Capital Partners Limited, a Hong Kong limited corporation; PTAM Holdings, LLC, an Illinois limited liability company; Reber Capital, LLC, a Delaware limited liability company; Phil Nussbaum, an individual; Richard Berg, an individual, and all of their respective officers, directors, employees and agents.

EXHIBIT A

1.57.   **"Transaction Value"** shall mean the total fair market value of all cash and any securities or other property or noncash consideration, including without limitation, any note from the purchaser, any funds paid from escrow or any earn-out payments received, receivable, paid or payable, directly or indirectly, by Debtor or any holders of Debtor's outstanding securities, including holders of options, warrants, stock appreciation rights or other rights to purchase or acquire securities, but expressly excluding the assumption or retirement of any of any debt or other liabilities or obligations of the Bank.

For purposes hereof, the fair market value of any securities or noncash consideration will be the value as reasonably determined by Debtor on the day prior to the consummation of a transaction; provided, however, that if such securities consist of securities with an existing public trading market, the value thereof shall be determined by the average of the last sales prices for such securities on the five (5) trading days ending five (5) calendar days prior to such date.

1.58.   **"TruPS Capital Securities"** mean the $3,250 aggregate liquidation amount of the Fixed/Floating Rate Capital Securities issued by Trust I pursuant to the TruPS Trust Declaration.

1.59.   **"TruPS Claims"** mean any and all Claims that could be asserted against Debtor by the Bondholder or by Wilmington Trust, in its capacity as trustee on behalf of the Bondholder, other than TruPS Trustee Fees, including any Claims related to or arising out of the TruPS Documents which Claims include, but are not limited to principal and interest as of the Petition Date, and if applicable, postpetition interest.

1.60.   **"TruPS Common Securities"** mean the common securities issued by Trust I, which is governed by the TruPS Trust Declaration.

1.61.   **"TruPS Documents"** shall mean the TruPS Indenture, the TruPS Trust Declaration, the TruPS Note, the TruPS Common Stock, and TruPS Guarantee and any related and ancillary documents and instruments.

1.62.   **"TruPS Guarantee"** shall mean the Guarantee Agreement dated as of March 29, 2007 by Debtor, as guarantor, and Wilmington Trust, as guarantee trustee, pursuant to which the Debtor agreed to guarantee payments of all amounts owed to holders of securities issued pursuant to the TruPS Indenture and the TruPS Trust Declaration.

1.63.   **"TruPS Indenture"** means the Indenture between Debtor, as issuer, and Wilmington Trust, as trustee, dated as of March 29, 2007 (as amended and/or supplemented) pursuant to which the Debtor issued the Fixed/Floating Rate Junior Subordinated Debt Securities Due 2037.

1.64.   **"TruPS Trust Declaration"** shall have the meaning set forth in the definition of Trust I.

1.65.   **"TruPS Trustee Charging Lien"** means any lien or other priority in payment arising prior to or after the Effective Date to which the TruPS Trustees, including but not limited to, the Indenture Trustee is entitled, against distributions to the Holders of TruPS Claims under the TruPS Documents, for payment of the TruPS Trustee Fees.

EXHIBIT A

1.66. "**TruPS Trustee Fees**" means the Claims for reasonable compensation, fees, expenses, disbursements, indemnification, subrogation and contribution of the TruPS Trustees, including but not limited to the Indenture Trustee, including, without limitation, internal default fees, attorneys', financial advisors' and agents' fees, expenses and disbursements, incurred by or owed to the TruPS Trustees, whether prepetition or postpetition, or whether prior to or after consummation of the Plan.  TruPS Trustee Fees accrued after the Petition Date are deemed Administrative Claims in accordance with the terms of the TruPS Documents, including the TruPS Indenture.

1.67. "**TruPS Note**" means the Fixed/Floating Rate Junior Subordinated Debt Securities due 2037.

1.68. "**TruPS Trustees**" mean the Indenture Trustee, Delaware Trustee, Guarantee Trustee and the Property Trustee.

1.69. "**Trust I**" means RMBT Capital Trust I, a statutory trust created under the laws of the State of Delaware pursuant to that certain Amended and Restated Declaration of RMBT Capital Trust I dated as of March 29, 2007 (as amended and/or supplemented) by and among Wilmington Trust, as Delaware trustee and institutional trustee, the Debtor as sponsor, and the Administrators named therein (the "**TruPS Trust Declaration**"), for the sole purpose of issuing securities representing undivided beneficial interests in Trust I's assets.

1.70. "**Unclassified Claims**" mean claims pursuant to Bankruptcy Code §§507(a)(2), (3) or (8) and any fees and charges against the estate under Chapter 123 of Title 28 of the United States Code.

1.71. "**Wilmington Trust**" means Wilmington Trust Company, a Delaware trust company, and its successors and assigns.

1.72. **Other Defined Terms.**  Any term used in the Plan that is not defined in the Plan, but that is used in the Code or Bankruptcy Rules, has the meaning assigned to that term in the Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

## ARTICLE 2
## DESIGNATION OF CLAIMS AND INTERESTS

2.1. **Introduction**.  Debtor is the proponent of the Plan.  The Plan provides for the repayment of certain unclassified Allowed Claims and the Allowed Claims of the Classes set forth below.

In accordance with § 1123(a)(1) of the Bankruptcy Code, Unclassified Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Section 3.1 of the Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class.  A Claim may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular class only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

EXHIBIT A

The following is a designation of all classes of Claims and interests other than Unclassified Claims.

2.2.     **Class 1**.  Class 1 consists of the Allowed Claim of the Senior Debt Holders.

2.3.     **Class 2**.  Class 2 consists of the Allowed Claims of the Holders of the TruPS Claims.

2.4.     **Class 3**.  Class 3 consists of the Equity Interests.

**ARTICLE 3**
**SPECIFICATION AND TREATMENT OF UNCLASSIFIED**
**PRIORITY CLAIMS AND SECURED TAX CLAIMS**

3.1.     **Unclassified Claims**.

A.     **Administrative Claims**.  Each allowed Administrative Claim shall be paid on the Effective Date from the Proceeds in cash in the amount of such Allowed Administrative Claim, except to the extent that the Holder of such Administrative Claim has agreed, in writing, to a different treatment of such Administrative Claim; provided, however, that postpetition trade debt, wages, commissions, taxes and other accrued expenses shall be paid by Debtor in the ordinary course of business following Confirmation to the extent not previously paid.  All payments for Professional Fee Claims shall be subject to approval of the Bankruptcy Court.  Any Administrative Claim not Allowed as of the Effective Date but Allowed thereafter, shall be paid within ten days after such Administrative Claim becomes an Allowed Administrative Claim.  It is believed that the only Administrative Claims are fees payable to the United States Trustee and Professional Fee Claims.

3.2.     **Unsecured Priority Tax Claims**.  The Allowed Claims of a type specified in Bankruptcy Code § 507(a)(8), Claims of governmental taxing authorities, shall be paid in full in the ordinary course of business following the Effective Date.  Debtor believes that there are no Priority Tax Claims that are not offset by Debtor's net loss carryforwards, which are expressly preserved under this Plan for the benefit of Debtor following the Effective Date.

3.3.     **Classified Claims and Interests.**

A.     **Class 1 Claim – Senior Debt Holders**.  The Class 1 Claim shall be Allowed in a reduced amount of up to $3,000,000.00, of which the Contingent Senior Debt Payment shall only be paid pursuant to Section 3.3(A)(v) below.  The Senior Debt shall be modified on the following terms:

i.     The Senior Debt, excluding the $1,000,000 maximum amount of the Contingent Senior Debt Payment, shall bear simple interest at a rate of six percent (6%) per annum commencing on the Effective Date and continuing thereafter until paid in full.

ii.     The Senior Debt, excluding the $1,000,000 maximum amount of the Contingent Senior Debt Payment, shall be due and payable on the Maturity Date.

EXHIBIT A

There is no prohibition against pre-payments of the Senior Debt, provided however, that prepayment shall not eliminate the Contingent Senior Debt Payment.

iii.      Quarterly interest only payments shall be made by Debtor on each of March 31, June 30, September 30 and December 31 to the Senior Debt Holders beginning on the earlier of (i) the date that the next quarterly payment is due following receipt of approval from the FDIC allowing the Bank to pay dividends to Debtor and Debtor is no longer subject to any legal or regulatory restrictions that prohibit or otherwise limit making such payments, or (ii) three years from the Effective Date.

iv.      In the event that Debtor is permitted to, and does, declare and pay dividends on its capital stock, then an amount equal to the amount of such paid dividends shall be a mandatory prepayment of the Senior Debt, excluding the $1,000,000 maximum amount of the Contingent Senior Debt Payment.

v.      If, prior to the later of (x) Maturity Date or (y) the date upon which the Senior Debt is paid in full, Debtor sells all or substantially all of its assets or the assets of the Bank, then Debtor shall be obligated to make payment on the Contingent Senior Debt Payment, the amount to be determined as follows:

      a.  if the Transaction Value received by either Debtor or its shareholders in the transaction is less than $3,000,000, then the amount is $0;

      b.  if the Transaction Value received by either Debtor or its shareholders in the transaction is between $3,000,001 and $5,000,000, then the amount is $500,000; or

      c.  if the Transaction Value received by either Debtor or its shareholders in the transaction is $5,000,001 or more, then the amount is $1,000,000.

vi.      Debtor is prohibited from selling or encumbering its interest in the Bank unless the holders of the Class 1 Claim are paid in full in cash at closing or otherwise consent.  The Contingent Senior Debt Payment is payable only if Debtor sells all or substantially all of its assets or the assets of the Bank.

Class 1 is impaired and is entitled to vote on the Plan.

**3.4      Class 2 Claims of TruPS Claims –**The Class 2 Claims shall be an Allowed Claim in the aggregate amount owing under the TruPS Documents, which amount is not less than $5,000,000.00.  In full satisfaction of the Allowed Claim of Class 2, holders of the TruPS Capital Securities shall receive its Pro Rata share of $320,000.00 in cash upon the deemed surrender of the TruPS Capital Securities in accordance with Section 5.4, which amount shall be paid in accordance with Section 5.7 promptly following the occurrence of the Effective Date. Debtor, as holder of the TruPS Common Securities shall not be entitled to any distribution on account of their TruPS Claim.  Class 2 is impaired and Holders of Allowed Claims in Class 2 are

EXHIBIT A

entitled to vote on the Plan.  By voting in favor of this Plan, the Bondholder shall be deemed to have represented and warranted to Debtor and to the TruPS Trustees that Bondholder is the sole owner, with both legal and equity title, of 100% of the TruPS Capital Securities and has the sole right to receive payment of the $320,000.00 in cash payment provided for in this Section 3.4.

**3.6     Class 3 Claim – Equity Interests**.  Class 3 consists of the Equity Interests in Debtor held as of the Petition Date.  Upon the Effective Date, in exchange for the New Capital Contribution, each Participating Investor shall retain their respective Equity Interests.  The Equity Interests of Holders who are not a Participating Investor shall have their Equity Interests cancelled by Debtor and such Holders shall no further interest in Debtor.  Class 3 is impaired, is deemed to have rejected the Plan and is not entitled to vote on the Plan.  The Holders of Equity Interests shall receive no distribution under the Plan except as provided in the connection with the Offering.

**3.7     Reservation of Rights Regarding Claims**.  Except as otherwise explicitly provided in the Plan, nothing shall affect Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  For the avoidance of doubt, the allowance of the Class 1 Claim as provided in Section 3.3(A) shall be final and binding upon Debtor and the Reorganized Debtor.

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1.     New Capital Contributions.**  Debtor shall conduct the Offering to raise the Proceeds.  In the Offering, the Holders of Debtor's Equity Interests will be entitled to make a New Capital Contribution to Debtor and in exchange will be entitled to retain their respective Equity Interests.  Non-Participating Shareholders shall have their Equity Interests cancelled by Debtor and such Holders shall have no further interest in Debtor.  Participating Investors will have the option, as determined by Debtor, to make additional Capital Contributions to Debtor in proportion to their pre-petition ownership of Debtor's Equity Interests and such Participating Investors shall receive additional Equity Interests in Debtor as needed to satisfy the Conditions to Confirmation.  The Offering will commence and be governed by the Plan of Offering attached hereto as Exhibit 1. Within fifteen (15) Business Days of completion of the Offering, Debtor shall file with the Bankruptcy Court and serve on all parties in interest a Report of the Offering.

**5.2.     Securities Law Compliance; Post-Effective Date Sales of Equity Interests**. Subject to approval by the Bankruptcy Court, the Confirmation Order shall provide that the Offering, to the extent it requires compliance with state and federal securities laws, including without limitation the Securities Act, is entitled to the exemption from registration provided under Bankruptcy Code section 1145.  Post-Effective Date sales of the stock shall be governed by applicable non-bankruptcy law.

EXHIBIT A

5.3.    **Post-Effective Date Corporate Governance**.   Upon the Effective Date, the Management shall consist of Douglas McClure who shall serve as Chief Executive Officer and Chairman of the Board of Directors and Dale Pike who shall serve as Secretary/Treasurer.  The Pre-Petition Articles of Incorporation and Bylaws shall govern the Reorganized Debtor following the occurrence of the Effective Date consistent with applicable federal and state laws and regulation.

5.4.    **Cancellation of Debt.**   Except as provided herein, all notes, instruments, other securities, and other evidence of debt issued, including but not limited to the TruPS Capital Securities, issued by Debtor shall be deemed terminated and cancelled upon the Effective Date. For the avoidance of doubt, but subject to paragraph A below, on the Effective Date, the TruPS Documents shall be deemed terminated and canceled, Trust I shall be deemed terminated and dissolved and the TruPS Trustees shall be discharged and released without any further action, provided however, at the discretion of the TruPS Trustees, Debtor shall cooperate in filing any required certificate of cancellation or other document or certificate required by the TruPS Documents.

A.    Notwithstanding the foregoing and anything contained in the Plan, the TruPS Documents, including the TruPS Indenture, shall continue in effect to the extent necessary to (i) allow the Post-Confirmation Debtor or TruPS Trustees, as applicable, to make distributions pursuant to the Plan, (ii) subject to Section 9.3 of the Plan, permit the TruPS Trustees to maintain its TruPS Trustee Charging Lien, (iii) subject to Section 9.3 of the Plan, permit the TruPS Trustees to maintain any right to indemnification, contribution, subrogation or other claim it may have under the TruPS Documents, including the TruPS Indenture, (iv) permit the TruPS Trustees to appear in the Bankruptcy Case, and (v) permit the TruPS Trustees to perform any functions that are necessary in connection with the foregoing clauses.

B.    If the record holder of a note or securities is HARE & CO. or its nominee or another securities depository or custodian thereof, and such notes or securities are represented by a global security held by or on behalf of HARE & CO. or such other securities depository or custodian, then the beneficial holder of such note or securities shall be deemed to have surrendered such holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by HARE & CO. or such other securities depository or custodian thereof.

5.5.    **Claims.**   The Post-Confirmation Management shall deposit the Proceeds in the Creditor Distribution Account which shall be used to fund payments required under the Plan.

A.    **Estimation of Unliquidated Contested Claims**.   As to any unliquidated Contested Claim, including Claims based upon rejection of Executory Contracts, or other Contested Claims, the Bankruptcy Court, upon motion by Debtor, may estimate the amount of the Contested Claim and may determine an amount sufficient to reserve for any such Claim. Any person whose Contested Claim is so estimated shall be paid by Debtor only up to an amount not to exceed the estimated amount of such Contested Claim, even if such Contested Claim, as finally allowed, exceeds the maximum estimated amount thereof.

B.   **Allowance of Contested Claims**.   Distributions shall be made with respect to any Contested Claim which becomes an Allowed Claim after the Effective Date on or as soon as practicable after the date on which each such Contested Claim becomes an Allowed Claim.   The amount of such distribution shall be calculated on a Pro Rata basis, so that the subject Claim receives an initial distribution equal to the total percentage distributions made prior to the date of such allowance on other Allowed Claims in its Class.   No interest shall be payable to the holders of Contested Claims on account of funds reserved by Debtor, if any, under this Plan to satisfy such Contested Claims.

C.   **Unclaimed Distributions**.   Pursuant to § 347(b) of the Bankruptcy Code, all unclaimed distributions made under the Plan shall be held by the Post-Confirmation Management and redistributed to Holders of Class 3 on a Pro Rata basis.

5.6.   **Means of Cash Payment.**   Cash payments made pursuant to this Plan shall be paid by checks drawn on an account maintained by Post-Confirmation Debtor.

5.7.   **Distribution**.

A.   Distribution of proceeds under the Plan shall be made in accordance with the Plan and the Confirmation Order.   Distributions on account of Allowed Class 2 Claims shall be made to the applicable TruPS Trustees who will, promptly upon satisfaction of Section 9.3 of the Plan, pay such amounts in accordance with Section 3.4 of the Plan through the facilities of HARE & CO. in accordance with (i) the customary practices of HARE & CO., and (ii) the Plan, the Confirmation Order and the applicable TruPS Documents, including the TruPS Indenture.

B.   The applicable TruPS Trustee acting as disbursing agent pursuant to clause (A) above shall only be required to act and make distributions in accordance with the terms of the Plan and the Confirmation Order and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against Debtor or the Reorganized Debtor as of the Effective Date or who does not otherwise comply with the terms of the Plan and the Confirmation Order.

5.8.   **Effect of Appeals.**   Unless the Confirmation Order is stayed pending appeal, at the option of Debtor, this Plan may be consummated notwithstanding the pendency of an appeal from the Confirmation Order or the timely service of filing a motion under Bankruptcy Rule 7052, 8002, 8003, 8015, 9023 or 9024.

## ARTICLE 6
## CLAIMS RESOLUTION

6.1.   **Deadline for Filing of Administrative Claim.**

A.   Any person asserting an Administrative Claim (other than a Professional Fee Claim or fees assessed under 28 U.S.C. § 1930 shall file an application therefore with the Bankruptcy Court not later than forty-five (45) days after the Effective Date in accordance with 11 U.S.C. § 503(b) and applicable Rules.

EXHIBIT A

B.      Any Person asserting a Professional Fee Claim shall file a fee application with the Bankruptcy Court not later than sixty (60) days after the Effective Date for professional services rendered and out-of-pocket costs incurred through the Effective Date.

C.      Any Administrative Claim or Professional Fee Claim not filed within the deadlines set forth above shall be forever barred, and Debtor shall be discharged of any obligation on such Claim.

D.      Objections to Administrative Claims shall be filed in the time set by the Bankruptcy Court.  All Administrative Claims which are not allowed in the Plan shall be Allowed Administrative Claims only to the extent allowed by the Bankruptcy Court in a Final Order.

6.2.    **Exclusive Right of Debtor to Object to Claims.**  As of the Effective Date of the Plan, Post-Confirmation Debtor shall have the exclusive right to file, serve and prosecute objections to Claims.

6.3.    **Time Limit for Filing Objections to Claims**

A.      Objections to Claims (other than Administrative Claims or Professional Fee Claims) shall be filed with the Bankruptcy Court and served upon each holder of the Claims to which objections are made not later than the Claims Objection Bar Date, or such later date as the Bankruptcy Court may order with respect to a particular Claim or group of Claims.

B.      The resolution of any objection to a Claim shall be governed by the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order or such provisions as may be established by the Bankruptcy Court.

C.      Any Claim as to which an objection is not timely filed shall be deemed an Allowed Claim, unless an extension of the Claims Objections Bar Date is obtained from the Bankruptcy Court in accordance with Rule 9006 or by agreement regarding any particular Claim or the allowance of such claim is reconsidered in accordance with § 502(j) of the Bankruptcy Code.

6.4.    **Late Claims.**  No Distribution shall be made on account of any Claims filed after the Bar Date, unless specifically allowed by Final Order of the Bankruptcy Court after notice and opportunity for hearing.

## ARTICLE 7
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1.    **Assumption and Rejection of Executory Contracts**.  On the Effective Date and except as otherwise provided in this Plan, all Executory Contracts that have not been the subject of a motion or order to assume and/or assign during the course of the Bankruptcy Case or pending the occurrence of the Effective Date, shall be deemed rejected by Debtor as of the Petition Date.  This Plan shall be deemed to constitute a motion to approve the above-described rejection and entry of an order confirming this Plan shall constitute approval of such rejection.

EXHIBIT A

7.2.     **Claim for Rejection Damages**.  All proofs of claim with respect to claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Bankruptcy Court within thirty (30) days after the earlier of (i) the date of the Bankruptcy Court order approving Debtor's rejection of such executory contract or unexpired lease, or (ii) the Confirmation Date.  Any claims not filed within such time shall be forever barred against Debtor and the Estate and any such Claims shall be disallowed in full.

## ARTICLE 8
## CONDITIONS PRECEDENT TO CONFIRMATION; CONSUMMATION OF THE PLAN; AND OUTSIDE DATE

8.1.     **Conditions to Confirmation.**  The following are conditions precedent to the occurrence of the Confirmation Date: the entry of **(a)** an Order finding that the Disclosure Statement contains adequate information pursuant to § 1125 of the Bankruptcy Code, and **(b)** the Confirmation Order in form and substance acceptable to Debtor, which shall provide, among other things, that Debtor is authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan.

8.2.     **Conditions to Effective Date.**  This Plan shall be binding on all creditors, Equity Interest Holders and other parties in interest on the date that following are conditions precedent occur which date is the Effective Date:

> A.     The Conditions to Confirmation shall have occurred;

> B.     The approval by the Board of Governors of the Federal Reserve System for the payments to Class 2 and the TruPS Trustee Fees in accordance with Section 9.3; and

> C.     The completion of the Offering in which the amount of Proceeds raised are sufficient to fund payments to Allowed Administrative Claims, the Allowed Claims of Class 2 and the TruPS Trustee Fees.

8.3     **Outside Date**.  If the Effective Date has not occurred on or before the Outside Date, then the Plan shall be deemed void and of not further effective and the rights and obligations of all parties in interest shall be reinstated as they exist immediately before the Petition Date, provided however, that Debtor may extend the Outside Date for 90 days by filing a written notice with the Court and providing notice thereof to all parties in interest.

## ARTICLE 9
## GENERAL PROVISIONS

9.1.     **Vestment**.  The occurrence of the Effective Date shall automatically vest in the Post-Confirmation Debtor all property of the Estate free and clear of all liens except as otherwise provided for in the Plan.

9.2.     **Payment of Statutory Fees**.  All fees payable pursuant to § 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation shall be paid on

EXHIBIT A

or before the Effective Date and shall continue to be paid thereafter in the ordinary course until entry of a Final Decree in accordance with § 1930.

9.3.    **Payment of Certain Fees and Expenses.**  Prior to or as soon as reasonably practicable following the Effective Date, Reorganized Debtor shall pay in Cash the sum of $65,000 to the TruPS Trustees (i) without defense, offset or reduction, (ii) without application or approval of the Bankruptcy Court, and (iii) without a reduction to the $320,000 payment to holders of TruPS Capital Securities pursuant to Section 3.4 of the Plan, as compromise and satisfaction of the TruPS Trustee Fees.  Nothing herein shall be deemed to impair, waive, discharge or negatively impact any TruPS Trustee Charging Lien, provided, however, that upon satisfaction of the TruPS Trustee Fees in the amount of $65,000, the TruPS Trustees shall not be entitled to assert the TruPS Trustee Charging Lien against any distributions to Holders of Allowed Class 2 Claims.

9.4.    **Modifications and Amendments**.  Debtor may alter, amend, or modify the Plan or any Plan exhibit in accordance with the Bankruptcy Code.

9.5.    **Retention of Jurisdiction**.    The Court shall retain jurisdiction over the Bankruptcy Case and related core and non-core proceedings, for the following purposes:

(a)    To hear and determine any and all objections to the allowance of claims or Equity Interests;

(b)    To determine any and all applications for allowances of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Code or the Plan;

(c)    To hear and determine any and all pending applications for the rejection or assumption, or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which Debtor is party, and to hear and determine any and all claims arising therefrom;

(d)    To hear and determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or that the Post-Confirmation Debtor may bring subsequent to the Effective Date or to which Debtor or the Post-Confirmation Debtor may be made a party;

(e)    To consider any modifications of the Plan, to remedy and defect or omission or reconcile any inconsistency in the Plan or in the orders of the Bankruptcy Court, including the Confirmation Order;

(f)    To hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan;

(g)    To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor or the Post-Confirmation Debtor;

(h)     To issue orders in aid of execution of the Plan as contemplated by § 1142 of the Code; and

(i)     To determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order.

9.6.    **Discharge of Debtor**.  On the Effective Date, Debtor shall be discharged to the extent provided in Bankruptcy Code § 1141.

9.7.    **Release of Liens, Etc.**  On the Effective Date, all liens, encumbrances and security interests upon or against any property of Debtor not properly perfected, except for liens and encumbrances specifically confirmed or affirmed pursuant to the terms of the Plan or by subsequent order of the Bankruptcy Court, shall be terminated, discharged, voided or released.

9.8.    **Exculpation, Limitation of Liability and Releases**

A.     Neither Debtor, the Senior Debt Parties, holders of the TruPS Capital Securities (including without limitation, the Bondholders), the TruPS Trustees, nor any of their respective predecessors and present or former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission occurring after the Petition Date and in connection with, relating to, or arising out of, the Bankruptcy Case, formulating, negotiating or implementing the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the consummation of the Plan, the Confirmation of the Plan, or the administration or implementation of the Plan or the property to be distributed under the Plan, except for their willful misconduct in connection with, relating to, arising out of, the Bankruptcy Case, formulating, negotiating or implementing the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

B.     Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtor, the Senior Debt Parties, holders of the TruPS Capital Securities (including without limitation, the Bondholders) or the TruPS Trustees or any of their respective predecessors or present or former members, officers, directors, employees, advisors or attorneys, for any act or omission occurring after the Petition Date and in connection with, relating to, or arising out of, the Bankruptcy Case, formulating, negotiating or implementing the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the consummation of the Plan, the Confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct.

C.     Effective on the Effective Date, Debtor and the Estate releases any and all claims or causes in action, known or unknown, against the Senior Debt Parties, the TruPS

EXHIBIT A

Trustees, holders of the TruPS Capital Securities (including without limitation, the Bondholders) and their respective officers, directors, employees, attorneys and agents, except for their willful misconduct.

9.9.   **Headings**.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan.

9.10.   **Severability**.  If, prior to the Effective Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.11.   **Notices**.  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.   All communications will be deemed delivered when received at the following addresses, including email:

**To the Debtor at:**

> First Flo Corporation
> ATTN:  Douglas L. McClure
> 5940 Buttermere Drive
> Colorado Springs, Colorado 80906
> Office:  719/784-6316
> Email:  dmcclure@rmbt.net

**With a copy to**:

> SHAPIRO BIEGING BARBER OTTESON LLP
> ATTN:  Duncan E. Barber, Esq.
> 7979 East Tufts Avenue, Suite 1600
> Denver, Colorado 80237
> Telephone:  720/488-0220
> Email:  dbarber@sbbolaw.com

**To a holder of an Allowed Claim:**

To such holder at the addresses set forth on the Schedules unless such creditor files a proof of claim, in which case, the address in the proof of claim shall control.  Holders of Allowed Claims may change such address by filing such change with the Bankruptcy Court and delivering notice thereof to Debtor and Debtor's counsel.

EXHIBIT A

9.12.   **Successors and Assigns**. The Plan will be binding upon Debtor, any Creditor affected by the Plan, Equity Interest Holders, and their heirs, successors, assigns and legal representatives.

9.13.   **Unclaimed Payments**.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan fails to negotiate a check, accept a distribution or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 9.10, within one (1) year of the date of such distribution, the person or entity is deemed to have released Debtor and abandoned any right to such payment or distribution under the Plan and Reorganized Debtor shall retained the funds represented by such unclaimed distribution.

## ARTICLE 10
## REQUEST FOR CONFIRMATION

10.1.   **Confirmation**.  Debtor, as proponent of the Plan, will request confirmation of the Plan pursuant to 11 U.S.C. §§ 1129(a) and (b), following commencement of the Case.  Debtor will seek approval of the Disclosure Statement at the time Debtor requests confirmation.  In the event Debtor does not obtain the necessary acceptances of its Plan, it may make application to the Court for confirmation of the Plan pursuant to 11 U.S.C. § 1129(b).  The Court may confirm the Plan if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or interests that is impaired and has not voted to accept the Plan.

DATED:  December 17, 2018.

**FIRST FLO CORPORATION**


By:___/s/ Dale E. Pike_____
    Name:  Dale E. Pike
    Title:  Authorized Agent


**APPROVED AS TO FORM**:

SHAPIRO BIEGING BARBER OTTESON LLP
Duncan E. Barber, 16768
Julie Trent, #17086
7979 East Tufts Avenue, Suite 1600
Denver, Colorado 80237
Telephone:  (720) 488-0220
Fax:  (720) 488-7711
Email:  dbarber@sbbolaw.com
    jtrent@sbbolaw.com
Attorneys for Debtor

EXHIBIT A

**Exhibit 1**
**To Plan of Reorganization**

**Plan of Offering**

The Offering will commence on the Confirmation Date. Following the occurrence of the Confirmation Date, Debtor will transmit notice of the Offering to all Equity Interests together with an election form, in form and substance as Exhibit 2 to this Plan ("Offering Election").

In the Offering, each Equity Interest will receive a right that will entitle the holder to a basic subscription right ("Basic Right") and an oversubscription right ("Oversubscription Right"). A Basic Right entitles its holder to retain Debtor's Common Stock by paying $2,217.82 per share[1] of Debtor's Common Stock currently held. Equity Interests may exercise their Basic Rights by submitting the Offering Election exercise form and the purchase price for the shares being retained within 14 calendar days of the mailing of the Offering Election for the Basic Rights (the "Basic Rights Expiration Date"). Investors electing not to retain their shares of Debtor's Common Stock will have such shares cancelled on the books and records of Debtor effective on the Basic Rights Expiration Date.

Under the Oversubscription Right, each Participating Investor exercising its Basic Rights in full will have the right to subscribe for additional shares of Debtor's Common Stock to the extent not retained by other holders of the Basic Rights.

Participating Investors who exercise their full Basic Rights will be notified in writing (the "Oversubscription Notice") within seven (7) calendar Days after the Basic Rights Expiration Date and may then exercise their Oversubscription Rights by submitting the oversubscription rights exercise form and the purchase price for Debtor's Common Stock being purchased under the Oversubscription Right within seven (7) calendar Days of the mailing of the Oversubscription Notice ("Oversubscription Expiration Date"). Debtor's Common Stock than it has available for such oversubscriptions, Debtor will allocate the available shares on a pro-rata basis to each Participating Investor of an Oversubscription Right.

The subscription rights may not be sold, transferred, or assigned, and will not be listed for trading on any stock exchange.

---

[1] This amount assumes the amount to be raised in the Offering is $425,000.00 and is calculated as follows: 425,000.00 divided by 191.63, which is the number of shares outstanding as of the Petition Date. The $425,000.00 figure will be adjusted at the time of the Offering to reflect actual Administrative Claims, which are assumed to be $40,000.00 in this example. That amount may increase or decrease based on the course of the Chapter 11 case.

EXHIBIT A

**Exhibit 2**
**To Plan of Reorganization**

**Offering Election**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FIRST FLO CORPORATION | ) | Case No.  18- |
| EIN: 84-0725524 | ) | |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |

**OFFERING ELECTION**

1.      [Insert name of Equity Interest holders], the undersigned shareholder (the "Shareholder"), intending to be legally bound, hereby irrevocably applies to purchase from Debtor the amount of shares of Common Stock ("Shares") indicated below.  This subscription for the Shares is submitted to Debtor in accordance with and subject to the terms and conditions described herein and as described in the Plan of Reorganization dated December17, 2018, filed by First Flo Corporation (the "Plan"), the Disclosure Statement of the Debtor dated December 17, 2018 ("Disclosure Statement"), and the Order Confirming the First Flo Plan of Reorganization (the "Confirmation Order" and collectively with Plan and Disclosure, the "Plan Documents"). Capitalized terms not defined herein shall have the meaning given them in the Plan Documents. Please check item 3 or 4 below.

2.      Shareholders failing to complete, sign and deliver this Election Form to Debtor on or before [insert actual date which will be the Basic Rights Expiration Date] will be deemed to be a Non-Participating Investor pursuant to Item 3 below.

3.      ☐  Shareholder elects to be a **Non-Participating Investor** in this Offering and any shares of Common Stock or Equity Interests in Debtor owned by Shareholder will be cancelled on the Debtors records.

4.      The Shareholder elects to be a **Participating Investor** as follows:

☐  Shareholder elects to exercise its Basic Rights to subscribe for _____ Shares
(Shareholder is eligible to subscribe for a maximum of [insert number of Shareholder's shares] Shares under this Basic Right).

☐  Shareholder elects to exercise the Oversubscription Right
(Shareholder may only elect the Oversubscription Right if Shareholder has elected to exercise the full amount of its Basic Rights above.  The specific amount of Shares eligible to be subscribed for under the Oversubscription Right will not be available until the Basic Rights Expiration Date.)

EXHIBIT A

Shareholder electing to exercise the Basic Rights and the Oversubscription Right represents, warrants and covenants as follows:

- Shareholder has received the Plan Documents, has carefully reviewed those Documents and understands and has relied on the information contained therein in making his, her or its decision to invest in the Shares;

- Shareholder has had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of Debtor concerning the offering of the Shares, and all such questions have been answered to the full satisfaction of the Shareholder;

- Shareholder acknowledges and agrees that an investment in the Shares involves a number of significant risks, including those set forth under the caption "RISK FACTORS" in the Disclosure Statement and generally in the other Plan Documents and the Shareholder understands each of these risks and is willing to accept such risks by making an investment in the Shares;

- Shareholder has adequate means of providing for the Shareholder's current needs and personal contingencies, is able to bear the substantial economic risks of an investment in the Shares for an indefinite period of time, has no need for liquidity in such investment, at the present time, could afford a complete loss of such investment;

- Shareholder represents that he, she or it has discussed the suitability of this investment with his or her personal legal, financial, investment, tax, and other advisors to the extent the Shareholder has determined it appropriate to do so and after such discussion, acknowledges and agrees that the investment in the Shares is a suitable investment for the Shareholder; and

- Shareholder must deliver the Purchase Price no later than [insert date which is Oversubscription Expiration Date. The Purchase Price will be delivered to First Flo Corporation as follows:  [insert].

**To exercise your Basic Rights, you must complete and return this Offering Election on or before _____ ___, 2019, so that it is received by 5:00 p.m. Denver, Colorado time.**

**Sending this Offering Election via email to dbarber@sbbolaw.com is acceptable.**

TYPE OR PRINT NAME:_____

SIGNED:_____

(IF APPROPRIATE) BY:_____

EXHIBIT A

AS (TITLE):_____

ADDRESS:_____

PLEASE SEND ORIGINAL TO:      ATTN:  Duncan E. Barber

                                          SHAPIRO BIEGING BARBER OTTESON LLP

                                          7979 East Tufts Avenue, Suite 1600

                                          Denver, CO  80237

                                          Telephone:  (720) 488-0220

                                          Facsimile:   (720) 488-7711

EXHIBIT A